[No. 26763.   Department Two.   December 20, 1937.]

THE STATE OF WASHINGTON, *Respondent,* v. H. S. LOW, *Appellant.*[1]

[1]Reported in 74 P. (2d) 458.

*Sweeney & Haugland* and *B. H. Camperson,* for appellant.

*B. Gray Warner* and *Henry Clay Agnew,* for respondent.

MILLARD, J.—The defendant was charged by information and convicted by a jury of the crime of practicing medicine without a license. So far as material, the information reads as follows:

". . . and by this information do accuse H. S. Low of the crime of PRACTICING MEDICINE WITHOUT A LICENSE, committed as follows, to-wit:

"He, said H. S. Low, in the county of King, state of Washington, on or about the 18th day of February, 1937, wilfully and unlawfully did practice and hold himself out as practicing medicine in this, that he, the said H. S. Low then and there did treat and pretend to treat and heal one Pat Hughes for disease and physical condition, to-wit: by the use of drugs, medical preparations, without having at the time of so doing a valid unrevoked certificate issued by the board of state medical examiners of the state of Washington, or by the state director of licenses of the state of Washington, authorizing said H. S. Low to practice medicine within the state of Washington, and without filing such certificate in the office of the county clerk of King county."

The defendant was sentenced to confinement in the county jail for a period of ninety days with the jail term suspended and to pay a fine of two hundred fifty dollars. The defendant appealed.

Error is first assigned on admission in evidence, over appellant's objection, of ten issues of the Seattle Star, a daily newspaper of Seattle.

In each of the ten copies of the Seattle Star appears a one-half page advertisement of the Sing Herb Company, 611 Pine street, Seattle. In that advertisement, which is typical and so far as is material reads as follows, is a copy of a letter purportedly received by

the Sing Herb Company from one of its customers or patients, expressing the customer's (or patient's) appreciation for the remarkable relief or cure obtained through use of the herb administered by H. S. Low:

". . . A great ever-increasing army of grateful patients now testifies for The Sing Herb Co. There is no disputing results like these. The proof is too overwhelming and convincing.

"Puyallup pioneer family says H. S. Low's Chinese herbs are wonderful. Sinus trouble, headaches, bronchial trouble and skin diseases all disappear. Thanks to the herbs, I am well. . . .

"New Health Is Here—Act Now

"Others Gaining Health—Why Not You?

"No matter with what you are afflicted, our wonderful herb treatment will positively relieve diseases of influenza, nervousness, female complaints, throat, heart, kidney, liver, stomach, neuritis, arthritis, chronic cough weakness, constipation, dizziness, neuralgia, headache, appendicitis, rheumatism, blood poison, catarrh, swollen glands, tonsilitis, lumbago, carbuncles, ear trouble, tumor, dropsy, epilepsy, jaundice; all disorders disappear without operation.

"Consultation Free    Visitors Welcome

"Office Hours: 9 to 6, Monday to Friday, inclusive. Saturday: 9 to 1 P. M.

"The Sing Herb Co. 611 Pine Street, Seattle, Washington

"H. S. Low, Directing Herbalist    Lady Attendant Phone MAin-8250

"Main office in Oakland, Calif.—24 years of service

"All herbs in bottles will be ready to take home. Also put up in packages.

"Ground Floor—No Stairs to Climb

"Tacoma    Seattle    Yakima"

The business manager of the Seattle Star testified that the Star had a substantial circulation throughout the city of Seattle, and that he, as business manager of the newspaper, received advertisements which his newspaper published for compensation. The account

of the advertiser in question is carried by the newspaper company as the Sing Herb Company, by H. S. Low. The bill for that advertising, which first appeared in December 16, 1936, issue of the Seattle Star and was still running in May, 1937, at the time of appellant's trial, is sent to the Sing Herb Company, 611 Pine street, Seattle.

The newspaper's business manager did not have any personal dealings with the appellant. All that he knew respecting this matter was that the advertisement appeared in each issue of his newspaper, that the advertising account was carried in the name of the Sing Herb Company, by H. S. Low, and that the bill for the advertising was sent to the Sing Herb Company, 611 Pine street, Seattle.

No showing was made that the appellant was the author of the advertisements. He did not testify, nor was any evidence offered in his behalf; hence, there was no admission by the appellant that he was the author, or authorized publication, of the advertisements.

No foundation was laid for admission in evidence of the newspaper advertising. The foundation of pure hearsay testimony, that of the business manager of the newspaper in which the advertising in question appears, is not a sufficient basis for admission in evidence of hearsay evidence such as the advertisements admitted in evidence in the case at bar.

"Printed matter in general bears upon itself no marks of authorship other than contents. But there is ordinarily no necessity for resting upon such evidence, since the responsibility for printed matter, under the substantive law, usually arises from the act of causing publication, not merely of writing, and hence there is usually available as much evidence of the act of printing or of handing to a printer as there would be of any other act, such as chopping a tree or building a fence. There is therefore no judicial sanction for considering

the contents alone as sufficient evidence: . . ."
4 Wigmore on Evidence (2d ed.), 578, § 2150.

"While newspapers may be admissible in evidence to impute to a party knowledge of a fact, or to prove current market prices, a newspaper account is merely hearsay evidence of the facts stated, and is not generally admissible in evidence to prove such facts, and the same rule applies to newspaper advertisements and notices." 22 C. J. 929, § 1137.

When it is important to ascertain whether certain information was current in a community at a particular time so as to impute knowledge to a particular person, it may then be permissible to admit in evidence the newspaper circulating at the time in such community for the purpose of showing that the fact in question was one of common local notoriety. 2 Wharton's Criminal Evidence (10th ed.), § 541. However, when it is sought to charge a particular advertisement on a particular person as the author, it is necessary to produce the original manuscript.

"It is only when the latter is non-producible that the printed copy can be received." 2 Wharton's Criminal Evidence (10th ed.), § 542.

In *Collins v. State*, 75 Tex. Crim. App. 534, 171 S. W. 729, the defendant, Ira Collins, was convicted of practicing medicine without a license. He assigned as error the admission in evidence over his objection of a copy of a newspaper containing an advertisement of a certain infirmary, "Ira W. Collins, Physician and Surgeon in Chief." It was held that the advertisement on its face disclosed that it was another person (Ira W. Collins) and not the defendant (Ira Collins). The court said:

"Another bill of exceptions recites that the court permitted the introduction of the evidence of Mr. Veazey, the auditor of the El Paso Herald, that the defendant had a credit on the books of the Herald Pub-

lishing Company for two hundred and forty-seven dollars. As this is presented we think the objections were well taken. This matter should be connected up in some way to make it admissible. The fact that defendant had $247 to his credit in the Herald Publishing Company did not prove or tend to prove, so far as the matter is shown, any issue in this case. Possibly or probably it might be connected up so as to make it admissible. If the state was trying to show that he was publishing to the world through a newspaper that he was practicing medicine and this money was placed there to pay for such advertisements in that paper, it might be admissible, but it must be connected in some way so as to make it admissible.

"Another bill in the same connection shows the court admitted, over appellant's objections, an advertisement that on its face showed it was that of another person and not the defendant, and copies of the 'El Paso Daily Herald,' containing advertisements of 'the A. T. Still Osteopathic Infirmary, Ira W. Collins Physician and Surgeon in Chief,' and advertising said infirmary as a hospital, for the cure of diseased persons, to which action appellant urged objections. If Ira W. Collins authorized the publication it would be admissible against him, but until that was shown in some way the mere fact that the A. T. Still Osteopathic Infirmary published his name with it would not make Collins responsible. If he was connected with that infirmary, and it was so shown, this evidence might be admissible to show that he was engaged in that particular character of practice of medicine, but unless it is connected in some way, the testimony would not be admissible."

By the testimony of another witness, the appellant was connected with the Sing Herb Company, therefore the advertisements which would otherwise be inadmissible in evidence because no foundation was laid for their introduction were admissible to show that the appellant was engaged in that particular character of practice of medicine which the state charged the appellant with practicing without a license.

An investigator for the prosecuting attorney's office

testified that, on February 18, 1937, subsequent to his examination of the advertisements described above, he called at the address stated in the advertisement, where he saw the appellant. He was met at the doorway by a woman. The appellant, who was sitting down, said to this investigator, "Just have a chair there; the doctor will be here in a minute." Very shortly thereafter, the appellant returned and stated to the investigator, "The doctor will be in in a minute." The testimony does not state that the appellant again left the room, but it is fairly inferable from the testimony of this witness that that is what the appellant did. This witness investigator testified that the appellant "come back and said, 'The doctor is in'. I went in and he [appellant] sat across the table." The appellant was the same man who told this witness, "The doctor will be in in a minute." The testimony as to what occurred as the appellant sat in a chair across the table from this witness is as follows:

"Then he asked what was the matter with me. I told him I had had a paralytic stroke. He asked me three or four times what was the matter with me and I told him; and he asked me how it happened. I told him that I was playing cards. He said,—advised me not to play any more cards, that it was hard on me. Then he advised me,—gave me a diet sheet, and advised me to follow that diet. He told me that the medicine would cost me ten dollars a week, and I asked him how much was the smallest amount I could buy, and he said three dollars. And he gave me two bottles to take home, and to take a whole bottle at once for treatment; and he said to be sure to come back to him after I had had these treatments. . . .

"Q. Handing you what has been marked State's Exhibit '2' for identification, I will ask you what that is? A. That is the diet sheet that he gave me. Q. Did he prepare that while you were there, or was it already prepared? A. He had it already prepared. He had a stack of them. Q. Handing you what has been marked

for identification State's Exhibits '3' and '4', I will ask you what that is? A. That is medicine that he gave me to take. Q. At the time that he gave it to you, were the typewritten directions thereon as they appear now? A. He went out there and got the bottles and wrapped it up,—he and another lady, I don't know who she was, supposed to be a nurse, I guess, she was dressed like a nurse. Q. When those were delivered to you was the typewritten matter that is on there — A. Yes, sir. Q. It was on there then when it was delivered to you? A. Yes, sir. . . . Q. Did the defendant make any statement to you as to whether or not this would be of any benefit as a treatment of a paralytic stroke? A. Yes, he said it would help me if I would follow his directions and come back to him. . . ."

The testimony of this witness, if true (the verdict reflects the jury's acceptance of it as true), establishes the fact that the appellant was connected with the Sing Herb Company, and that he was engaged in that particular character of practice of medicine described in the advertisement. Under these facts, the newspapers were admissible in evidence.

The appellant next challenges the sufficiency of the evidence to sustain the conviction. The only evidence in addition to that recited above is that the appellant did not have a license as a physician and surgeon, and that he did not have a license to practice any of the healing arts.

In the large display advertisements of the Sing Herb Company by H. S. Low is the claim that "Our wonderful herb treatment" will relieve practically every disease of which medical science has any knowledge. The statute under which the appellant was charged reads as follows:

"Any person who shall practice or attempt to practice, or hold himself out as practicing medicine and surgery in this state, without having, at the time of so

doing, a valid, unrevoked certificate as provided in this act, shall be guilty of a misdemeanor. . . ." Rem. Rev. Stat., § 10018 [P. C. § 3471].

The information charged appellant "wilfully and unlawfully did practice and hold himself out as practicing medicine . . ." The information is in the language of the statute. The statute defining the powers of a physician or surgeon authorizes one licensed to practice medicine and surgery

". . . to use drugs or what are known as medicinal preparations in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, or other physical or mental conditions." Rem. Rev. Stat., § 10008 [P. C. § 3732].

One holding a license under this statute to practice as a physician or surgeon has a complete and unrestricted field. Any person operating anywhere in this field is violating the statute unless he holds a license. If he practices or holds himself out as practicing medicine and has not been granted a license so to do, he is guilty of misdemeanor. In some of the advertising appears the statement, "consultation free." Appellant also called himself "the doctor," when the investigator of the prosecuting attorney's office called on him for treatment. The advertisements all emphasized "our wonderful treatment."

The appellant diagnosed the case of the witness to the extent of prescribing some liquid. We agree with counsel for the state that what that liquid was, made no difference. The appellant was, at all events, as charged by the information, in violation of the statute, holding himself out as practicing medicine. It was not necessary for the state to have an analysis made of the liquid prescribed by the appellant for the witness. The question whether, if the appellant were licensed to

practice in one of the restricted fields of healing, an analysis of the medicine would be material, is not before us.

Appellant next complains that instruction No. 4 was erroneous, in that only the second or last portion of the statute defining the term "drug" was incorporated in the instruction. The assignment is without merit, as this was the only portion of the statute applicable to the facts in the case at bar.

The assignment that the definition of the phrase "practicing medicine" contained in instruction No. 7 is erroneous is not entitled to consideration, as only a portion of the instruction of which appellant complains is set forth in the brief. *Lund v. Seattle,* 163 Wash. 254, 1 P. (2d) 301.

Appellant finally contends, and respondent concedes, that the trial court erred in imposing, in addition to the fine of two hundred fifty dollars, penalty of ninety days' confinement—the jail term was suspended —in the county jail.

The statute (Rem. Rev. Stat., § 10018) makes the crime of which appellant was convicted a misdemeanor but does not provide a penalty therefor. In such a case, the statute, reading as follows, is applicable:

"Every person convicted of a misdemeanor for which no punishment is prescribed by any statute in force at the time of conviction and sentence, shall be punished by imprisonment in the county jail for not more than ninety days, or by a fine of not more than two hundred and fifty dollars." Rem. Rev. Stat., § 2266 [P. C. § 8701].

The jail sentence and fine are in the alternative; both may not be imposed.

The judgment is reversed, and the cause is remanded with direction that punishment in conformity to the statute be imposed.

BEALS, GERAGHTY, and ROBINSON, JJ., concur.

STEINERT, C. J. (dissenting)—Being convinced that the judgment should be reversed and the action dismissed, I dissent from the majority for the following reasons:

I. The court erred in admitting in evidence the newspaper advertisements. No foundation was laid for their admission. The original manuscript was not produced, nor was it shown that it could not be produced.

"And when the object· is to charge a particular advertisement on a particular person as its author, it is necessary to produce the original manuscript. It is only when the latter is nonproducible that the printed copy can be received." 2 Wharton's Criminal Evidence (10th ed.), § 542; also 11th ed., § 804, footnote.

Furthermore, there was no evidence that appellant was the author of the advertisements or that he directed their publication. In *State v. Dunham*, 31 Wash. 636, 72 Pac. 459, which was a prosecution for practicing medicine without a license, the state introduced a newspaper advertisement purporting to be that of the defendant. Holding that such evidence did not establish the crime, this court said:

"Clearly, there is here no proof of the crime charged. As against the presumption of innocence, it cannot be presumed from the mere fact that the advertisement appeared in a paper that it was authorized by the appellant, nor will it be presumed that he was the person named in the advertisement, though the name therein and his name be the same. Without the aid of such presumptions, there is no evidence in the record of guilt, and hence no evidence upon which a jury could found a verdict of guilty."

· See, also, 4 Wigmore on Evidence (2d ed.), 578, § 2150; 3 Jones Commentaries on Evidence (2d ed.), 1817, § 989; 22 C. J. 929, §§ 1137, 1138; *Collins v. State*, 75 Tex. Crim. App. 534, 171 S. W. 729.

The majority recognize the law as just stated, but seek to escape its controlling effect on the theory that the testimony of one of the state's witnesses established the connection of appellant with the Sing Herb Co. Therein is the tacit admission that the advertisement is the vital element in this case, and that, without it, conviction could not have been obtained; therefrom, also, must arise the presumption that the evidence, if improperly admitted, was prejudicial.

In my opinion, the vice of the position taken by the majority is contained in the inference that appellant's connection with the Sing Herb Co. renders competent and admissible that which, under the rules of evidence, is not. If it be contended that the advertisement was that of the Sing Herb Co., still the state did not lay a foundation for its introduction, because, as already shown, the original manuscript was not produced or accounted for, nor was it shown that the Sing Herb Co. directed its publication. The fact that appellant was connected with the Sing Herb Co. has nothing to do with the admissibility of the evidence against appellant in the absence of a showing that the Sing Herb Co. authorized the advertisement. The state did not show that the published advertisement was authentic or authorized by either the Sing Herb Co. or appellant. Without this vital connecting link, the offered evidence was inadmissible.

II. The court erred in overruling appellant's challenge to the sufficiency of the state's evidence. The statute under which appellant was charged reads as follows:

"Any person who shall practice or attempt to practice, or hold himself out as practicing medicine and surgery in this state, without having, at the time of so doing, a valid, unrevoked certificate as provided in this act, shall be guilty of a misdemeanor. . . ." Rem. Rev. Stat., § 10018 [P. C. § 3741].

This section of the statute does not define what practicing medicine is. In so far as any definition of that term is furnished by any statute, it is found in Rem. Rev. Stat., § 10008 [P. C. § 3732], on which both counsel rely. By that section, the certificate to practice medicine authorizes the holder thereof

" . . . to use drugs or what are known as medicinal preparations in or upon human beings and to sever or penetrate the tissues of human beings and to use any and all other methods in the treatment of diseases, injuries, deformities, or other physical or mental conditions."

In the information, appellant was charged as follows:

"He, said H. S. Low, in the County of King, State of Washington, on or about the 18th day of February, 1937, wilfully and unlawfully did practice and hold himself out as practicing medicine *in this*, that he, the said H. S. Low then and there did treat and pretend to treat and heal one Pat Hughes for disease and physical condition, to-wit: *by the use of drugs, medical preparations*, without having at the time of so doing a valid unrevoked certificate issued by the Board of State Medical Examiners of the State of Washington, . . ." (Italics mine.)

The crime charged is one that did not exist at common law, but is purely statutory. The state was therefore under the burden of proving beyond a reasonable doubt that appellant was operating within the prohibition of the statute. *State v. Carey,* 4 Wash. 424, 30 Pac. 729. The statute, being penal, is to be strictly construed. *State v. Eberhart,* 106 Wash. 222, 179 Pac. 853; *State v. Hart,* 136 Wash. 278, 239 Pac. 834; *State v. Herr,* 151 Wash. 623, 276 Pac. 870; *State v. Diebold,* 152 Wash. 68, 277 Pac. 394; 16 C. J. 1360, § 6.

To sustain the charge contained in the information, the state was required to prove that appellant treated the supposed patient "by the use of drugs, medical

[medicinal] preparations." The state's evidence discloses that what appellant did was to supply the state investigator, who acted as a prospective patient, with a diet sheet and two bottles containing herbs. It was not shown that the herbs consisted of or contained drugs or medicinal preparations, and it cannot be presumed that they did. No chemical analysis of the contents of the bottles was made, nor was there any proof whatever that the bottles contained the prohibited substances. The state having failed to prove that appellant used drugs or medicinal preparations, as charged, the challenge to the sufficiency of the evidence should have been sustained.

Seemingly in answer to what has just been said and in opposition to the contention of appellant, the majority say that it makes no difference what the contents of the bottles were, and that it was unnecessary to have an analysis of the liquid made, because appellant was at all events guilty of *holding himself out* as practicing medicine. In other words, if the bottles contained milk or even water, appellant was nevertheless guilty under the terms of the statute. The difficulty with that position is that the charge against appellant was specific. It was alleged that he

" . . . wilfully and unlawfully did practice and hold himself out as practicing medicine *in this*, that he, . . . then and there did treat and pretend to treat and heal one Pat Hughes for disease and physical condition, to-wit: *by the use of drugs, medical preparations*, . . ." (Italics mine.)

The very essence of the charge is that appellant used drugs or medical preparations, and that was the very thing that the state failed to prove.

III. The court erred in giving the following instruction:

"The term 'drug' shall include any substance or mixture of substances intended to be used for the cure,

mitigation or prevention of disease of either man or other animals."

Rem. Rev. Stat., § 6145 [P. C. § 2536], defines drugs as follows:

"The term 'drug,' as used in this act, shall include all medicines and preparations recognized in the United States Pharmacopoeia or National Formulary for internal or external use, *and any substance or mixture of substances intended to be used for the cure, mitigation or prevention of disease of either man or other animals . . .*" (Italics mine.)

In its instruction, the court limited itself to that part of the statute which I have italicized. By so doing, and without making any qualifications, the court gave the jury to understand that *any* substances or mixture of substances used as a cure or prevention of disease was to be considered as a drug. Reverting to what has already been suggested, the word "drug" would then equally apply to any article of food or drink, no matter how innocuous it might be. Under that interpretation, anyone who should treat disease by a food diet or any form of drugless healing would be guilty of *practicing medicine.* I do not believe that any such construction is tenable.

The sum and substance of the matter is that the state *might have* proved appellant guilty of the offense charged, had it made its proof competent and admissible, but it wholly failed to do so.

I dissent.